## Case No. 342.

The AMY WARWICK, (Dunlop, Moncure & Co., Claimants.)

[2 Spr. 143;[1] 24 Law Rep. 494.]

District Court, D. Massachusetts. April, 1862.[2]

PRIZE PRACTICE—CIVIL WAR—CONFISCATION—CONSTRUCTION OF STATUTE.

1. The decision upon the claim of Edmond, Davenport & Co., 2 Spr. 123, [The Amy Warwick, Case No. 341,] to a part of this cargo, affirmed.

[See The Amy Warwick, Case No. 341, note.]

2. The language of the prize law, that property is to be condemned as enemy's, or is to be deemed enemy's, or is impressed with a hostile character, does not necessarily import that the owner is personally hostile, but only that his property has been placed in such relation to the enemy that a court of prize is to deal with it as it if belonged to the enemy.

3. The statute of 1862, c. 50, (12 Stat. 374,) for the better administration of the law of prize, affects only the mode of procedure. It prescribes no rule of decision, but leaves the court to be guided by the general law as known to the prize courts of the civilized world.

4. This statute applies to cases arising in this civil war, as well as to those that may arise in international war, and makes no distinction between them in the mode of procedure, or the rules of decision.

[See The Amy Warwick, Case No. 341, note.]

5. The rights of war exist only while the war continues. Titles to property, or political jurisdiction, acquired during the war by the exercise of belligerent rights, may survive the war.

6. The conquest of a foreign country gives absolute and unlimited sovereign rights. But no nation makes such a conquest of its own territory.

[Cited in Semmes v. City Fire Ins. Co., Case No. 12,651; U. S. v. Huckabee, 16 Wall. (83 U. S.) 434; Ford v. Surget, 97 U. S. 614.]

7. In this civil war, the military power is called in only to maintain the government in the exercise of its legitimate civil authority. No success can extend the powers of any department beyond the limits prescribed by the organic law.

[Cited in Semmes v. City Fire Ins. Co., Case No. 12,651.]

8. When the United States takes possession of any rebel district, it acquires no new title, but merely vindicates that which previously existed; and it is to do only what is necessary for that purpose.

[Cited in Semmes v. City Fire Ins. Co., Case No. 12,651; Ford v. Surget, 97 U. S. 614.]

9. Belligerent confiscations take effect only upon property of which possession is taken during the war. As against property which continues under the control of the enemy, they are wholly inoperative.

10. If possession is acquired by or after the peace, then previous legislation may take effect; but it will be by the right of sovereignty, not as an act of war.

11. Confiscations which go not against an offending thing, but arise from the personal delinquency of the owner, should be inflicted only upon due conviction of personal guilt.

12. Such penalties have no connection whatever with the decisions of prize courts enforcing belligerent rights upon property captured at sea.

[In admiralty. Libel in rem against the brig Amy Warwick and cargo, as prize of war. The vessel sailed from Rio Janeiro May 29, 1861, with a cargo of coffee, destined to Hampton Roads for orders. By her charter party she was to go either to Richmond, New York, Philadelphia, or Baltimore. She was captured August 10, 1861, by the United States ship of war Quaker City, and brought into this district for condemnation. Dunlop, Moncure & Co., of Richmond, Va., claim a portion of her cargo. Property condemned, and claim dismissed.

[The brig was claimed by David Currie and others, and the balance of the cargo by Edmond, Davenport & Co., all of Richmond, Va. Both claims were dismissed, (the former decree unreported, the latter reported sub nom. The Amy Warwick, Case No. 341.) Another claim was filed by J. L. Phipps & Co., an English house at Rio Janeiro, for an advance made to supply a deficit of funds to purchase the cargo. This claim was allowed. The Amy Warwick, Id. 343. On appeal to the circuit court the decrees of the district court were duly affirmed, (nowhere reported, opinion not now accessible,) whereupon all of the claimants except Phipps & Co., appealed to the supreme court. Affirmed. The Prize Cases, 2 Black, (67 U. S.) 635.]

R. H. Dana, Jr., U. S. Atty., for captors.

S. Bartlett and E. Bangs, for claimants.

SPRAGUE, District Judge. These claimants, Dunlop, Moncure, & Co., having been permanent residents of Richmond, Virginia, before and ever since the sailing and capture of this vessel, are in the same condition as were Edmond, Davenport, & Co., the claimants of the four hundred bags of coffee which have already been condemned. [The Amy Warwick, Case No. 341.] If the opinion given in that case be adhered to, this claim must be dismissed. I have seen no reason to change that opinion. On the contrary, two important propositions, namely, that Richmond is enemy's country, and that permanent residence therein by the owner of property captured at sea is cause of condemnation without proof of personal disloyalty, have been strengthened by subsequent events and the recent legislation of congress. Richmond is not only the capital of rebel Virginia, but has continued to be the seat of the usurped confederate government; and no country was ever more absolutely under the dominion of an enemy, or more clearly within his territorial limits. Every reason why residence should cause condemnation in maritime captures in any war applies in full force to the case now before me. These claimants do not even offer proof of their loyalty, and there is a high

---

[1] [Reported by Hon. Richard H. Dana, Jr., and here reprinted by permission.]

[2] [Affirmed by circuit court, (decree nowhere reported; opinion not now accessible.) Affirmed by supreme court. sub nom. The Prize Cases, 2 Black, (67 U. S.) 635.]

probability that they are willingly co-operating with the enemy. But, if this be not so, they were at the time of this capture, and have ever since continued to be, under his absolute control; and that control is an inexorable military despotism. Every dollar put into their hands or under their control is, to all practical purposes, in the hands of the enemy, and adds to his strength. The question before me is, whether this property shall be restored to the claimants, or condemned as prize. No intermediate or other course is asked or suggested by either party. Should the court decree restoration, it must order the $120,000 now in the registry to be paid over to these inhabitants of Richmond. It will be delivered to their agent, who resides in New York, and will be subject to their order. They will doubtless order it to be transmitted in gold or exchanged to their banker in London, and it will be there held and disposed of for the benefit of the rebel confederates, and may at once be invested in munitions of war, and shipped for the rebel states by way of Havana, and then the fleet of the United States must be upon the alert endeavoring to intercept and capture the proceeds of the money now in the possession of this court. Any theoretical views which lead to such a result should be distrusted.

The decrees of the district courts condemning property as hostile, have been objected to on the ground that they pronounce the owners to be enemies, when in fact they may be personally loyal. But it is a mistake to suppose that those judgments go beyond the fact of permanent residence, and assert personal guilt in the owner. This mistake has probably arisen from misapprehending the import of certain language of frequent recurrence in prize law, such as that property is to be condemned as enemy's, or is to be deemed enemy's, or that it is impressed with a hostile character. These are equivalent expressions. They do not necessarily import that the owner is personally hostile, but only that his property has been placed in such relation to the enemy that a court of prize is to deal with it as if it belonged to the enemy. It is quite a mistake to suppose that property is never to be condemned except for personal delinquency of the owner. Even under the municipal law, ships and cargoes are liable to condemnation for the use that has been made of them where there has been no guilty knowledge or intent on the part of the owner; and, in prize law, condemnation is not the infliction of personal punishment on proof of individual guilt, but it is a matter of belligerent policy to destroy the commerce of the enemy and diminish his resources. This is emphatically set forth in the case of The Venus, 8 Cranch, [12 U. S.] 253, where property of a citizen of the United States was condemned by reason of his residence, although, as the supreme court expressly declares, there was no personal guilt. The same doctrine is found in many other cases. The objection, when scrutinized, involves a denial of the power of the court to make any condemnation as prize under the principles and according to the rules of the general law, and the practice of nations; and this is to deny to the United States the exercise of belligerent rights. For there is no right of war more clearly established or more universally exercised than that of maritime captures; and no reason can be assigned why the United States should be deprived of the power of exercising this important right in the present war. How far the peculiar circumstances of this or any other conflict should induce forbearance, like many other questions of policy in the conduct of the war, is to be determined by the commander-in-chief or the legislature. It is for them, or one of them, to say what captures should be made, and what cases, or classes of cases, shall be sent in, and condemnation sought by prosecution. In adjudicating such cases, the courts must be guided and governed by established principles and rules of decision. This is well known to the other departments of the government; and, when they send a captured vessel to the court to be there proceeded against as a prize, they necessarily intend, in the absence of other instructions, that the court shall proceed and decide according to the established rules and principles of prize law. There is no other guide. That the great conflict in which we are now engaged is war, in the legal sense of the term, is shown by the express language of the constitution in defining the crime of treason; that the United States, in this war, has, on the ocean, all the rights of belligerents, has never been distinctly controverted. To deny it is to break up the blockade, and every condemnation under it. Those who have thought that the courts cannot enforce the belligerent rights of the nation without the action of congress, should, I think, be satisfied that there has been sufficient legislation. In addition to the statutes passed during the last summer, and particularly the ratifying act of the 6th of August, which was adverted to in my former opinion, congress, on the twenty-fifth day of March last, (Acts 1862, c. 50; 12 Stat. 374,) passed an act to regulate the mode of procedure in prize cases. The first section relates to the custody and preservation of captured property, and the taking of evidence. The second and third sections relate to expenses, and the compensation of officers. The fourth section relates to the disposition of prize property after final condemnation. This statute affects only the mode of procedure. It gives no direction as to the principles or doctrines by which the court is to be guided in its adjudications. It does not touch the rule of decision. The title of this statute declares it to be an "Act for the bet-

ter administration of the law of prize." The court, then, is to administer the law of prize, and that must be the general law as known to the prize tribunals of the civilized world, with such modifications as may be made by our own legislature. But to what cases is this general law of prize to be applied? This question is answered by the fifth section of the statute, which declares that its provisions "shall apply as well to cases now pending as to all future cases of maritime captures." This court is thus expressly directed to administer the prize law in cases now pending or hereafter to arise in this civil war, as well as in cases of maritime captures in future international wars. No distinction is indicated between these two classes of captures, or in the rules of law which are to be applied to them. Further still: the legislature expressly recognizes the pendency of prize cases. In many of those cases, the only question was whether property should be condemned by reason of the residence of the owner in the enemy's country. This question had been decided by the district courts of three judicial districts, all concurring in decrees of condemnation. This was well known; and yet congress, in passing an act for the better administration of the prize law in cases then pending or hereafter to arise, does not prescribe any rules of decision or in any way discountenance those which had been adopted by the courts: this may be deemed an acquiescence in or a tacit approbation of those rules.

An objection to the prize decisions of the district courts has arisen, from an apprehension of radical consequences. It has been supposed that, if the government have the rights of a belligerent, then, after the rebellion is suppressed, it will have the rights of conquest; that a state and its inhabitants may be permanently divested of all political privileges, and treated as foreign territory acquired by arms. This is an error,—a grave and dangerous error. The rights of war exist only while the war continues. Thus, if peace be concluded, a capture made immediately afterwards on the ocean, even where the peace could not have been known, is unauthorized, and property so taken is not prize of war, and must be restored. Wheat. Int. Law, 619. Belligerent rights cannot be exercised when there are no belligerents. Titles to property or to political jurisdiction acquired during the war, by the exercise of belligerent rights, may indeed survive the war. The holder of such a title may permanently exercise, during peace, all the rights which appertain to his title; but they must be rights only of proprietorship or sovereignty; they cannot be belligerent. Conquest of a foreign country gives absolute and unlimited sovereign rights. But no nation ever makes such a conquest of its own territory. If a hostile power, either from without or within a nation, takes possession

and holds absolute dominion over any portion of its territory, and the nation by force of arms expels or overthrows the enemy and suppresses hostilities, it acquires no new title, but merely regains the possession of which it had been temporarily deprived. The nation acquires no new sovereignty, but merely maintains its previous rights. Id. 616. During the war of 1812, the British took possession of Castine, and held exclusive and unlimited control over it, as conquered territory. So complete was the alienation, that the supreme court held that goods imported into it were not brought into the United States, so as to be subject to import duties. U. S. v. Rice, 4 Wheat. [17 U. S.] 246. Castine was restored to us under the treaty of peace; but it was never supposed that the United States acquired a new title by the treaty, and could thenceforth govern it as merely ceded territory. And if, before the end of the war, the United States had, by force of arms, driven the British from Castine, and regained our rightful possession, no one would have imagined that we could thenceforth hold and govern it as conquered territory, depriving the inhabitants of all pre-existing political rights. And when, in this civil war, the United States shall have succeeded in putting down this rebellion and restoring peace in any state, it will only have vindicated its original authority, and restored itself to a condition to exercise its previous sovereign rights under the constitution. In a civil war, the military power is called in only to maintain the government in the exercise of its legitimate civil authority. No success can extend the powers of any department beyond the limits prescribed by the organic law. That would be not to maintain the constitution, but to subvert it. Any act of congress which would annul the rights of any state under the constitution, and permanently subject the inhabitants to arbitrary power, would be as utterly unconstitutional and void as the secession ordinances with which this atrocious rebellion commenced. The fact that the inhabitants of a state have passed such ordinances can make no difference. They are legal nullities; and it is because they are so, that war is waged to maintain the government. The war is justified only on the ground of their total invalidity. It is hardly necessary to remark, that I do not mean that the restoration of peace will preclude the government from enforcing any municipal law or from punishing any offence against previously existing laws. Another objection to those decisions of the district courts is founded upon the apprehension that they may lead to or countenance cruel and impolitic confiscations of private property found on land. This apprehension is unfounded. No such consequence can legitimately follow. Those decisions undoubtedly assert that the United States has the rights of a belligerent. But the extent of those

rights on land, or the manner in which they are to be exercised, was not discussed. They were not specially mentioned, except to say that enemy's property found by a belligerent on land, within his own country, on the breaking out of a war, will not be condemned by the courts, although it would be if found at sea. This distinction, so far as it goes, tends to show that the doctrine of maritime captures is not to be applied to seizures on land. But the danger upon which this objection is founded, does not arise from the administration of the prize law by the courts, or the exercise of belligerent rights by military commanders upon military exigencies. The objection really arises from fear of the legislation of congress. It is apprehended that they may pass sweeping or general acts of confiscation, to take practical effect only after the rebellion shall have been suppressed; that whole estates, real and personal, which have not been seized during the war, may be taken and confiscated upon coming within reach of the government, after hostilities shall have ceased. This, as we have seen, would not be the exercise of belligerent rights, the war being at an end. Belligerent confiscations take effect only upon property of which possession is taken during the war. As against property which continues under the control of the enemy, they are wholly inoperative. If possession be acquired by or after the peace, then previous legislation may take effect, but it will be by the right of sovereignty, not as an act of war. Under despotic governments, the power of municipal confiscation may be unlimited; but under our government the right of sovereignty over any portion of a state is given and limited by the constitution, and will be the same after the war as it was before. When the United States takes possession of any rebel district, it acquires no new title, but merely vindicates that which previously existed, and is to do only what is necessary for that purpose. Confiscations of property, not for any use that has been made of it, which go not against an offending thing, but are inflicted for the personal delinquency of the owner, are punitive; and punishment should be inflicted only upon due conviction of personal guilt. What offences shall be created, and what penalties affixed, must be left to the justice and wisdom of congress, within the limits prescribed by the constitution. Such penal enactments have no connection whatever with the decisions of prize courts, enforcing belligerent rights upon property captured at sea during the war. I have thus noticed the objections which have been made to the former opinion of the court, so far as they have come to my knowledge. They do not seem to me to be well founded. The claim of Dunlop, Moncure, & Co. must be dismissed.

[NOTE. This case was affirmed on appeal. The Prize Cases, 2 Black, (67 U. S.) 635. See The Amy Warwick, Case No. 341, note.]